The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Ramon Ricardo GUTIERREZ,
Defendant–Appellee.

No. 09SA69.

Supreme Court of Colorado,
En Banc.

Dec. 14, 2009.

Kenneth R. Buck, District Attorney, Nineteenth Judicial District, Christian J. Schulte, Chief Deputy District Attorney, Michael J. Rourke, Assistant District Attorney, Greeley, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, James Merson, Deputy Public Defender, Greeley, Colorado, Attorneys for Defendant–Appellee.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

The district attorney brings this interlocutory appeal from the trial court's order granting defendant Ramon Gutierrez's motion to suppress evidence obtained from his tax returns and other documents contained in his client file, which was seized from the offices of his tax preparer. Gutierrez is charged with identity theft and criminal impersonation based on the information obtained from these tax records, which show that he reported income from work that he performed while providing his employer with a social security number registered to another person.

Gutierrez's client file was one of approximately 5,000 client files seized from Amalia's Tax and Translation Services ("Amalia's Tax Service"), in Greeley, Colorado, pursuant to a search warrant. The trial court found that the search warrant was invalid because it did not provide probable cause to believe that Gutierrez's client file contained evidence of a crime. Noting that the district attorney and the Weld County Sheriff's Department referred to the investigation as "Operation Numbers Game," the trial court described the search as "extraordinarily wide-sweeping," and concluded that it was "an exploratory search" designed to permit the sheriff to rummage through "the confidential records of thousands of persons based on nothing more than a suspicion that one or more of them may have committed a crime." The trial court also found that the good faith exception to the exclusionary rule did not apply because the affidavit was "so lacking in indicia of probable cause" that no reasonably cautious officer could have relied upon it. We agree. To hold otherwise in this case would allow the good faith exception to swallow the exclusionary rule and would permit state law enforcement to circumvent the Fourth Amendment as well as a complex

federal statutory regime designed to protect taxpayers' privacy.

A taxpayer has a reasonable expectation of privacy in his or her tax return and supporting documentation such as a W–2 form. To overcome that expectation of privacy, a search warrant must show probable cause to believe that the tax records contain evidence of criminal wrongdoing by that taxpayer or the tax preparer. The warrant in the present case did not identify the tax preparer or Gutierrez as the target of the search. It made no showing of probable cause as to Gutierrez or any other client of Amalia's Tax Service. Rather, the warrant relied solely on the fact that Amalia's Tax Service prepared tax returns pursuant to the requirements of federal law, which permit a taxpayer who does not have a social security number to file a tax return using a taxpayer identification number.

The warrant in this case permitted an unbridled search conducted, as the trial court described, "with the hope of uncovering evidence of criminal activity, which practice seems more in line with the writs of assistance in colonial America."[1] We hold that the warrant here contravenes basic freedoms guaranteed by the Fourth Amendment. We also hold that the good faith exception does not apply because this warrant was so lacking in indicia of probable cause that no reasonably well-trained officer could have relied upon it. Hence, we affirm the trial court's suppression order, and we return this case to the trial court for proceedings consistent with this opinion.

## II. Facts and Proceedings Below

To put this case in context, we briefly provide some background on income tax filing procedures followed by undocumented immigrants. Under federal law, any person who is physically present in the United States and earns an income is required to pay tax on that income, even if that person may not be authorized to work in the United States. *See* 26 U.S.C. § 7701 (2006). The Internal Revenue Service ("IRS") requires that taxpayers receive a unique identifying number. For most taxpayers this number is their social security number ("SSN"). *See* 26 C.F.R. § 301.6109–1 (2009). Most persons who are not authorized to work in the United States, however, may not obtain an SSN. 42 U.S.C. § 405(c) (2006). To ensure that unique identifying numbers are provided to all those who are obligated to pay taxes, the IRS requires taxpayers who are not eligible for an SSN to apply for an Individual Tax Identification Number ("ITIN"). 26 C.F.R. § 301.6109–1. It is important to note that many individuals issued ITINs are present in this country legally. ITINs are issued irrespective of immigration status because resident and nonresident aliens may have U.S. tax return and payment responsibilities under the Internal Revenue Code. *See id.*

In discussing the facts, we first describe the contents of the affidavit supporting the warrant. We then supplement this description with the trial court's findings, and other record sources, to provide a more complete picture of the events that transpired.

The affidavit supporting the search warrant reflects that the Weld County Sheriff's Department knew the following facts before applying for and executing the warrant. In August of 2008, the Weld County Sheriff's Department investigated an undocumented immigrant named Servando Trejo on charges of identity theft. Trejo admitted to investigators that he entered the country illegally, and, once here, he purchased a false name and SSN in order to obtain employment. In

---

1. In *Stanford v. Texas,* 379 U.S. 476, 482, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965), Justice Stewart explained that the Fourth Amendment was designed, in part, to protect the people from the excessive governmental intrusion that characterized the British writ of assistance, which had "given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." Justice Stewart noted that "[v]ivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists." *Id.* As such, the Fourth Amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Id.* at 481, 85 S.Ct. at 509–510.

the course of the investigation, Trejo told investigators that he had filed income tax returns and that his returns were prepared and filed by Amalia's Tax Service, located in Greeley, Colorado. Trejo explained to investigators that, because he did not have an authentic SSN, he used an ITIN instead of an SSN when filing his return. He also explained that Amalia's Tax Service had helped him obtain the ITIN. Trejo told investigators that he "worked for several different companies in the [a]gricultural industry" and that "everyone knows to go to [Amalia's Tax Service] for their taxes."

Investigators also interviewed Amalia Cerrillo, owner and operator of Amalia's Tax Service. According to the affidavit, Cerrillo confirmed that she knowingly prepares tax returns for undocumented immigrants. The affidavit also states that Cerrillo said, "if people [are] applying for an ITIN they are illegal aliens" and that, of clients utilizing the ITIN process, "almost all" provide her with an SSN "that belongs to someone else."[2]

However, neither Cerrillo nor Trejo mention Gutierrez by name or otherwise refer to his client file. As the trial court found, "[t]here is absolutely no information contained in the affidavit that identifies the name or date of birth of any client of Amalia's Tax Service, other than that of Mr. Trejo." The trial court also noted that Amalia's Tax Service provided translation services and found that "the affidavit fails to state what percentage of [Amalia's Tax Service's] business was tax preparation and what

percentage involved translation services, and whether [Cerrillo] had records in her [Greeley] office that just related to the translation business."

The affidavit states that, after interviewing Cerrillo and consulting with the department of revenue, the sheriff's office hypothesized that it could obtain evidence of identity theft and criminal impersonation if it looked through the files of each client and compared the identifying information on the client's Form 1040 with the client's wage earning documentation, such as a W–2 or Form 1099. According to this theory, if a client had supplied a fictitious SSN to an employer, then the client's Form 1040 would list an ITIN as the taxpayer identification number, whereas the client's wage earning documentation would contain the fictitious SSN. In other words, the identification numbers on the two forms would not match.[3]

According to the affidavit supporting the search warrant, the sheriff's office used this theory—that a mismatch of the client's ITIN and SSN would indicate that the client was using someone else's SSN—to support its search warrant for evidence of identity theft and criminal impersonation. Though directing a search of Amalia's Tax Service, the affidavit contains neither facts nor allegations linking Amalia's Tax Service to participation in any substantive state crime. All parties agreed at trial and before us that the affidavit did not allege or imply that the business had committed a crime.[4] Instead,

2. The affidavit does not establish Cerrillo's basis of knowledge for this statement, and she is incorrect in concluding that all people who apply for ITINs are here illegally. *See* 26 C.F.R. § 301.6109–1.

3. It is important to note that a mere mismatch of the client's ITIN and SSN as recorded in wage earning documentation would not indicate that the client was using someone else's SSN, rather than a purely fictitious SSN, as required to support a charge of identity theft under section 18–5–902, C.R.S. (2009). Indeed, as the People concede in their briefing before this court, a mismatch would not necessarily establish that the client had worked using a false or fictitious SSN, a fact which would be required to support a charge of criminal impersonation under section 18–5–113, C.R.S. (2009).

4. The affidavit supporting the search warrant indicates, "Agent Stephen Bratten, with Colorado Department of Revenue (DOR) reviewed the case and informed Detective Noonan [that] Amalia's Tax Service is conducting business according to Internal Revenue Service (IRS) guidelines and has not violated any laws." Nor could the affidavit raise an inference that Amalia's Tax Services committed a crime. Any crime that may have been committed by the misuse of a social security number occurred during the tax year for which Amalia's Tax Service was subsequently preparing returns pursuant to federal tax law. Thus, any crime of the taxpayer was fully completed before Amalia's Tax Service's involvement with respect to the tax return filings. The filing of a federal tax return reporting the past possible misuse of a social security number to comply with federal law requiring the reporting of taxable income and the payment of federal taxes does not constitute a crime.

this investigation, referred to as "Operation Numbers Game" by the district attorney and the Weld County Sheriff's Department, was supported by the officer's belief that some unknown number of the business's 5,000 clients had committed, or were committing, crimes. The warrant authorized investigators to seize, among other things, all tax returns for years 2006 and 2007 that were filed using an ITIN that did not match the SSN on the wage earning documentation. The trial court found that "law enforcement personnel arbitrarily chose the tax years 2006 and 2007, even though there was no information that [Amalia's Tax Service] filed tax returns using the methods outlined in the affidavit for either, both, or neither of those years."

According to the affidavit supporting the warrant for Gutierrez's arrest, when officers arrived at Amalia's Tax Service, they asked Cerrillo to help them locate the 2006 and 2007 tax returns and return information. Cerrillo explained to the officers that the information they sought was filed by individual client, not by year. Rather than sort the documents on-site, the officers took all the client files in Amalia's Tax Service's possession, loaded them into forty-nine boxes, and brought them back to the sheriff's office. In all, officers seized and searched 5,000 client files containing tax returns and return information. The search warrant inventory reveals that officers also seized three computers and numerous data storage devices, such as CDs and floppy disks. Files containing 2006 or 2007 tax returns and mismatching ITIN and SSN information as described by the warrant were copied in their entirety, including any of the clients' tax returns filed before 2006 that were present in the file. Approximately 1,300 of the 5,000 files seized met the criteria set forth in the warrant and copies were made of those files before they were returned. No copies were made of the remaining 3,700 files. During the search, officers looked through Gutierrez's client file and found a mismatch between the ITIN listed on the Form 1040 filed in 2006 and the two different SSNs listed on two W–2 forms from the same year. The W–2s documented wage earnings from different employers. After running the two SSNs through an inter-

net database, officers determined that neither number had been issued to Gutierrez and one currently belonged to another individual. A warrant was issued for Gutierrez's arrest, and he was charged with one count of identity theft and two counts of criminal impersonation. Gutierrez filed a motion in the trial court to suppress evidence of his tax return and tax return information, arguing that, among other reasons, they were obtained in violation of the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution.

The trial court granted Gutierrez's motion, relying on both the federal and state constitutions. The court ruled that the officers' search of Gutierrez's client file was not supported by a valid warrant because the affidavit failed to establish probable cause to believe that evidence of a crime would be located in Gutierrez's individual client file. In particular, the court concluded that the search was "extraordinarily wide-sweeping," describing it as "an exploratory search" designed to permit the sheriff to rummage through "the confidential records of thousands of persons based on nothing more than a suspicion that one or more of them may have committed a crime."

The trial court further ruled that suppression of Gutierrez's tax return and W–2 form was appropriate. The court ruled that the "good faith" exception to the warrant requirement articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and adopted by our legislature in section 16–3–308, C.R.S. (2009), was inapplicable because the officers' reliance on the warrant was not "objectively reasonable." In reaching this conclusion, the court relied on the fact that the affidavit supporting the warrant lacked any facts that would provide individualized suspicion to search Gutierrez's file. The court stated that the affidavit was "so lacking in indicia of probable cause" that no reasonably cautious officer could have relied upon it.

### III. Gutierrez Has Standing to Object to a Search of His Client File

■ When reviewing an order suppressing evidence, we review questions of law de novo

but defer to the trial court's findings of fact, provided the findings are supported by competent evidence in the record. *People v. Kirk*, 103 P.3d 918, 921 (Colo.2005).

We begin our analysis of this case by determining whether Gutierrez has standing to object to a search of his client file—that is, whether Gutierrez may claim that he was the victim of a search or seizure for Fourth Amendment purposes. *Alderman v. United States*, 394 U.S. 165, 173, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ A defendant's ability to invoke the protections of the Fourth Amendment depends upon whether the government's conduct constituted an invasion into an area "in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Thus, Gutierrez may assert the protections of the Fourth Amendment over his client file if he maintained a reasonable expectation of privacy in his file.

■ We analyze whether a defendant seeking to suppress evidence maintains a reasonable expectation of privacy in the area searched or the items seized under the two prong analysis first set forth by Justice Harlan in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). *United States v. Knotts*, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (quoting Justice Harlan's concurrence in *Katz*); *California v. Greenwood*, 486 U.S. 35, 39–40, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (same). To satisfy the *Katz* test a defendant must demonstrate, first, that he has "exhibited an actual (subjective) expectation of privacy and, second, that the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. 507.

■ As a practical matter, the Supreme Court has recognized that the subjective expectation prong in the *Katz* analysis may sometimes "provide an inadequate index of Fourth Amendment protection." *Smith v. Maryland*, 442 U.S. 735, 740 n. 5, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *see also United States v. White*, 401 U.S. 745, 786, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting). As a result, many courts have failed to distinguish between the two prongs of *Katz*, "and little attention has been given to the independent significance of the first factor or to precisely how it is to be interpreted." Wayne R. LaFave, 1 *Search and Seizure: a Treatise on the Fourth Amendment* § 2.1(c) (4th ed.2004). In light of this fact, we view the subjective prong of *Katz* as an important, but not dispositive, element of our analysis.

■ Turning to the first *Katz* prong, we conclude that competent evidence in the record supports the trial court's finding that Gutierrez demonstrated an actual, subjective expectation of privacy in his personal income tax information and his client file. The tax return information supplied by Gutierrez to Amalia's Tax Service was stored securely in a file cabinet inside the business's premises and nothing in the record indicates that Gutierrez took any action to expose his otherwise private files to public scrutiny. Gutierrez was thus "entitled to assume that" his tax information would "not be broadcast to the world." *Katz*, 389 U.S. at 352, 88 S.Ct. 507. The district attorney does not challenge this finding, and we do not disturb it on appeal.

■ Having determined that Gutierrez demonstrated a subjective expectation of privacy, we now consider the second prong of the *Katz* analysis and ask whether Gutierrez's expectation of privacy is one "society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. 507. In order to ascertain our societal understanding of what constitutes a legitimate, reasonable privacy interest, we must look to some "source outside of the Fourth Amendment." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In the present case, we find such sources in state and federal law conferring upon the taxpayer a legitimate expectation of privacy in his or her tax return. *See Florida v. Riley*, 488 U.S. 445, 451, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (plurality opinion) (looking to Federal Aviation Administration regulations to determine whether the defendant's expectation of privacy was objectively reasonable); *Doe v. Bro-*

*derick,* 225 F.3d 440, 450–51 (4th Cir.2000) (looking to federal statutes addressing the availability of a patient's medical records for purposes of criminal investigation to determine the scope of Fourth Amendment's protection of such records); *DeMassa v. Nunez,* 770 F.2d 1505, 1506–07 (9th Cir.1985) (per curiam) (looking to state and federal statutes and case law to determine that an attorney's client had a reasonable expectation of privacy in his client file stored in the attorney's office).[5]

Regarding Colorado case law, we have repeatedly held that tax returns, although not privileged, are confidential and that a court may not order their disclosure absent demonstration of a compelling need for the information they contain. *Stone v. State Farm Mut. Auto. Ins. Co.,* 185 P.3d 150, 156 (Colo.2008); *Alcon v. Spicer,* 113 P.3d 735, 737 (Colo. 2005); *Losavio v. Robb,* 195 Colo. 533, 539, 579 P.2d 1152, 1156 (1978). These cases recognize that, aside from disclosing a taxpayer's income, information normally regarded as sensitive and personal, such as "marital status, dependents, business dealings, investments, religious affiliations, charitable inclinations, property holdings, and debt obligations," can be readily discerned from a tax return. *Stone,* 185 P.3d at 156 (internal citations omitted). Indeed, a tax return is capable of revealing "the skeletal outline of a taxpayer's personal and financial life." *Id.* (internal citations omitted).

Colorado statutory law provides similar privacy protections for taxpayers and their tax returns. Subject to limited exceptions, sections 39–21–113(4)(a) and 39–21–113(6), C.R.S. (2009) impose criminal penalties on any department of revenue employee or agent who divulges information obtained in the course of an investigation or disclosed in a tax return. In *Losavio,* we held that the policy of confidentiality set forth in section 39–21–113(4)(a) carries great weight in determining whether a subpoena duces tecum is unreasonable or oppressive. 195 Colo. at 539, 579 P.2d at 1156.[6] Although these statutes apply only to information in the custody of the Colorado Department of Revenue, we reasoned in *Alcon* that these statutes indicate that the General Assembly "has 'expressed a strong public policy of protecting the confidentiality of taxpayers' state income tax returns.'" 113 P.3d at 743 (quoting *Losavio,* 195 Colo. at 539, 579 P.2d at 1156). Therefore, we applied this policy to protect a tax return from civil discovery, even when the return was in the custody of the individual taxpayer, not the department of revenue. 113 P.3d at 742–43.

Having determined that Colorado law protects an individual's privacy interest in his or her tax returns, we now consider the laws of other states and applicable federal law. *See California v. Greenwood,* 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (explaining that reasonable expectation of privacy under the Fourth Amendment turns on "our *societal* understanding" and does not "depend on the law of the particular State in which the search occurs." (internal quotation marks omitted)).

First, we note that every other state in the country (including the District of Columbia) has adopted an analogous statutory regime, evincing a national consensus that taxpayers' tax returns are considered confidential, private communications with the department of revenue and should be made available for non-tax purposes only in the rarest of circumstances.[7]

---

5. Although *DeMassa* and *Broderick* relied in part on the existence of testimonial privileges protecting the information at issue, a privilege need not exist in order to find a reasonable expectation of privacy in a particular place, object, or communication. *See, e.g., Katz,* 389 U.S. at 352, 88 S.Ct. 507 (finding reasonable expectation of privacy in non-privileged telephone call concerning wagers on sporting events).

6. Although *Losavio* states in dicta that the Fourth Amendment "does not protect documents already in the public domain, such as income tax returns," this proposition is at odds with the main thrust of that case, which is that income tax returns are entitled to protection precisely because they are *not* in the "public domain." 195 Colo. at 540, 579 P.2d at 1157. This point has been clarified by our subsequent cases, *Stone* and *Alcon,* cited above.

7. Alabama: Ala.Code § 40–2A–10 (2009); Alaska: Alaska Stat. § 43.05.230 (2009); Arizona: Ariz.Rev.Stat. Ann. § 42–2002 (2009); Arkansas: Ark.Code Ann. § 26–18–303 (West 2009); California: Cal. Rev. & Tax.Code § 19542 (West 2009); Connecticut: Conn. Gen.Stat. Ann. § 12–15 (West 2009); Delaware: Del.Code Ann. tit.

Second, we note that federal law also protects an individual's privacy interest in his or her tax returns. During the 1970s, in the wake of the Watergate scandal and presidential abuses of executive authority to inspect tax returns and return information, Congress significantly revised 26 U.S.C. § 6103, which addresses IRS disclosure of tax information to other federal and state agencies. *See Report to Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions* at 3, 15–18 (October 2000), *available at* http://www.treas.gov/offices/tax-policy/library/confide.pdf; *see also* 26 U.S.C. § 6103(a)-(i) (2006) (establishing that tax returns are confidential and may not be disclosed to other agencies, except under certain limited circumstances).

Congress was particularly concerned with the government's use of tax information in the prosecution of non-tax crimes. *Id.* at 63–64. Addressing the revision of section 6103, the Senate Finance Committee articulated this concern, noting, "[T]he present extent of actual and potential disclosure of return and return information to other Federal and State agencies for nontax purposes breaches a reasonable expectation of privacy on the part of the American citizen with respect to such information." S.Rep. No. 94–938, at 317 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3438, 3747.

Congress responded to this concern by amending section 6103 to provide taxpayers with adequate assurances that the confidentiality of their returns would be safeguarded. The Senate Report explained, "[T]he information that the American citizen is compelled by our tax laws to disclose to the Internal Revenue Service [is] entitled to essentially the same degree of privacy as those private papers maintained in his home." *Id.* Therefore, "The Justice Department and any other Federal agency responsible for the enforcement of a nontax criminal law should be required to obtain court approval for the inspection of a taxpayer's return or return information." *Id.*

Congress implemented these concerns by revising section 6103 in several important ways. Section 6103 now mandates that, subject to limited statutory exceptions, "[r]eturns and return information shall be confidential." 26 U.S.C. § 6103(a). Federal agencies shall not inspect tax returns or other tax information provided by the taxpayer or the taxpayer's representative for purposes of prosecuting non-tax crimes. 26 U.S.C. § 6103(i)(1)(A). And tax return information may not be disclosed to state or local law enforcement for purposes of non-tax criminal investigation or proceedings. 26 U.S.C. § 6103(a), (d).[8]

30, § 368 (2009); District of Columbia: D.C.Code § 47–4406 (2009); Florida: Fla. Stat. Ann. § 213.053 (West 2009); Georgia: Ga.Code Ann. § 48–7–60 (West 2009); Hawaii: Haw.Rev. Stat. § 235–116 (2009); Idaho: Idaho Code Ann. § 63–3077 (2009); Illinois: 35 Ill. Comp. Stat. 5/917 (2009); Indiana: Ind.Code § 6–8.1–7–1 (2009); Iowa: Iowa Code Ann. § 422.72 (West 2009); Kansas: Kan. Stat. Ann. § 12–1,108 (2009); Kentucky: Ky.Rev.Stat. Ann. § 131.190 (West 2009); Louisiana: La.Rev.Stat. Ann. § 47:1508 (2009); Maine: Me.Rev.Stat. Ann. tit. 36 § 191 (2009); Maryland: Md.Code Ann., Tax-Gen. § 13–202 (West 2009); Massachusetts: Mass. Gen. Laws Ann. ch. 62C, § 21 (West 2009); Michigan: Mich. Comp. Laws Ann. § 205.28 (West 2009); Minnesota: Minn.Stat. Ann. § 270B.02 (West 2009); Mississippi: Miss.Code Ann. § 27–7–83 (2009); Missouri: Mo. Ann. Stat. § 32.057 (West 2009); Montana: Mont.Code Ann. § 15–30–303 (2009); Nebraska: Neb.Rev. Stat. § 77–2115 (2009); Nevada: Nev.Rev.Stat. § 372.750 (2009); New Hampshire: N.H.Rev. Stat. Ann. § 77–B:26 (West 2009); New Jersey: N.J. Stat. Ann. § 54:50–8 (West 2009); New Mexico: N.M. Stat. Ann. § 7–2C–13 (2009); New

York: N.Y. Tax Law § 697(1)(e) (McKinney 2009); North Carolina: N.C. Gen.Stat. Ann. § 105–259(b) (West 2009); North Dakota: N.D. Cent.Code § 57–38–57 (2009); Ohio: Ohio Rev. Code Ann. § 5747.18 (West 2009); Oklahoma: Okla. Stat. Ann. tit. 68, § 205 (West 2009); Oregon: Or.Rev.Stat. § 314.835 (2009); Pennsylvania: 72 Pa. Stat. Ann. § 7353(f) (West 2009); Rhode Island: R.I. Gen. Laws § 44–30–95(c) (2009); South Carolina: S.C.Code Ann. § 12–54–240(A) (2009); South Dakota: S.D. Codified Laws § 10–1–28.3 (2009); Tennessee: Tenn. Code Ann. § 67–2–108(a) (West 2009); Texas: Tex. Tax Code Ann. § 111.006; Utah: Utah Code Ann. § 59–1–403 (West 2009); Vermont Vt. Stat. Ann. tit. 32, § 3102 (2009); Virginia: Va.Code Ann. § 58.1–3 (West 2009); Washington: Wash. Rev.Code Ann. § 84.08.210 (West 2009); West Virginia: W. Va.Code § 11–10–5d(a) (2009); Wisconsin: Wis. Stat. Ann. § 71.78 (West 2009); Wyoming: Wyo. Stat. Ann. § 39–11–102(A)(i)(c) (2009).

8. As noted, several exceptions to this rule exist. *See, e.g.,* 26 U.S.C. § 6103(i)(7)(A)(ii) (exception for investigation of or response to terrorist activi-

In addition, tax return information may be admitted as evidence in federal non-tax proceedings only if the judge makes an explicit finding that the information is probative evidence of a matter relating to the commission of a crime or the guilt or liability of a party. 26 U.S.C. § 6103(i)(4)(A). And, in ruling on the admissibility of such evidence, the trial court must "give due consideration to congressional policy favoring the confidentiality of returns and return information...." 26 U.S.C. § 6103(i)(4)(D).

Congress has also imposed criminal penalties for unlawful disclosure and inspection of tax returns, 26 U.S.C. §§ 7213, 7213A (2006), and provided taxpayers with a civil remedy for damages caused by unlawful disclosure. 26 U.S.C. § 7431 (2006).[9]

Finally, Congress has declared that a taxpayer who, like Gutierrez, has placed his or her tax return information in the custody of a professional tax preparer retains an expectation of privacy in such information.[10] 26 U.S.C. § 7216 (2006). Under section 7216, a tax preparer who knowingly or recklessly discloses "any information furnished to him for, or in connection with, the preparation of" a tax return "shall be guilty of a misdemeanor," unless the disclosure is made pursuant to a court order or another statutory exception. Indeed, the district attorney acknowledges that "pursuant to 26 U.S.C.A. § 7216, [Ama-

lia's Tax Service] was forbidden to hand over [its clients' tax] records without a court order." Thus, federal statutory law protects an individual's privacy interest in his or her tax return and return information.

■ We recognize that, as a general matter, when a person voluntarily discloses information to a third party, even for a limited purpose, that person usually ceases to have a reasonable expectation of privacy in such information under the Fourth Amendment because he assumes the risk that the third party will reveal that information to the government. That principle, articulated in *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), is inapplicable here for several reasons.

■ First, as explained above, both Colorado and federal law protect the privacy of tax return information even when it is in the custody of the IRS, a state department of revenue, or a tax preparer. In our view, this reflects a broad societal understanding that, when an individual prepares and files a tax return, he does so for the IRS and no one else. And he retains an expectation of privacy in such information against intrusion by criminal law enforcement agencies, even when disclosed to others for the purpose of facilitating compliance with state and federal tax laws.[11]

ty by state agency acting jointly with a federal agency); 6103(i)(3) (exception for cases of imminent threat of death or physical injury); 6103(*l*)(6) (exception for enforcement of child support obligations).

9. Congress agreed that taxpayers retain a reasonable expectation of privacy in personal information turned over to the IRS and noted that protection of taxpayer privacy is "an important component of continued voluntary compliance with the internal revenue laws." Office of Tax Policy, Department of the Treasury, *supra*, at 33; *see also* S.Rep. No. 94–938, at 317, 1976 U.S.C.C.A.N. at 3747. This view continues to be expressed by the Department of the Treasury today. Because the success of our income tax system depends to a great degree on voluntary compliance, it is the position of the Department of the Treasury that sharing confidential taxpayer information with immigration authorities would negatively affect tax administration. *Social Security Number High–Risk Issues: Hr'g Before the Subcomm. on Social Security and Subcomm. on Oversight of the H. Comm. on Ways and Means*, 109th Cong. 10–14 (2006) (testimony

of former IRS Commissioner Mark Everson). The ITIN program has substantially increased the number of people paying taxes; in 2005, about 1.4 million tax returns were filed through the program, a 40 percent increase in such filings over the previous year. *Id.* The Treasury Department has expressed that sharing ITIN mismatch information with immigration authorities would discourage compliance and negatively impact revenue by "driving certain economic activities underground" to cash-based activities. *Id.*

10. A tax preparer is defined as "[a]ny person who is engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax imposed by chapter 1, or any person who for compensation prepares any such return for any other person...." 26 U.S.C. § 7216.

11. Generally speaking, of course, there can be no reasonable expectation of freedom from governmental intrusion in information that has already been disclosed to the government. However, we

Second, the facts giving rise to an individual's privacy interest in his or her tax return contrast starkly from the facts presented in *Miller*. In *Miller*, the Supreme Court held that a bank depositor had no reasonable expectation of privacy in his bank records maintained by his bank pursuant to the Bank Secrecy Act because Congress enacted the Bank Secrecy Act for the very purpose of maintaining records that would " 'have a high degree of usefulness in criminal tax, and regulatory investigations and proceedings.' " *Id.* at 442–43, 96 S.Ct. 1619 (quoting the Bank Secrecy Act of 1970, 12 U.S.C. § 1829b(a)(1)(A)). Thus, because the very purpose of the Bank Secrecy Act is to collect and maintain information in order to facilitate criminal investigations, a depositor has no right to assume that information voluntarily disclosed to a bank will not, in turn, be voluntarily disclosed by the bank to the government. *Id.* at 443, 96 S.Ct. 1619.

Section 6103, as we have explained, creates the opposite expectation. Unlike the Bank Secrecy Act, section 6103 makes it more difficult for law enforcement agencies to obtain tax returns for non-tax criminal investigations and prosecutions. Likewise, pursuant to sections 6713 and 7216, a tax preparer who reveals the contents of a client's tax return is subject to civil penalties and criminal prosecution, unless a court order or one of a handful of narrow exceptions allows for such disclosure. *See* 26 U.S.C. § 6103(a)-(i) (2006)

 These facts persuade us that a taxpayer who entrusts his tax return to the care of a tax preparer for purposes of complying with federal and state tax law does *not* assume the risk that the tax preparer will voluntarily divulge the information to law enforcement. *See Broderick*, 225 F.3d at 450–51 (distinguishing *Miller* on the grounds that the applicable statute, unlike the Bank Secrecy Act, made the information at issue more difficult for law enforcement to obtain, thus evincing a societal expectation of privacy); *DeMassa*, 770 F.2d at 1506–07; *see also*

Wayne R. LaFave, *supra*, § 11.3 ("Even in the face of *Miller*, however, there may be certain other relationships which are so confidential in nature that the customer of the business will not be deemed to have assumed the risk from his own limited disclosure of facts about his personal life.").

Finally, while "[t]he lack of any legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act," *Miller*, 425 U.S. at 442, 96 S.Ct. 1619, the legislative history of section 6103 reveals that Congress was cognizant of the taxpayer's reasonable expectation of privacy in his tax return and was determined to defend it.

 We conclude that the state and federal laws, which shield a taxpayer's return from unfettered access by government officials, express and affirm the taxpayer's reasonable expectation of privacy in information disclosed to the IRS or to a state department of revenue in a tax return. Taxpayers are entitled to expect that this information will not be open to scrutiny by state or federal agencies responsible for the investigation or prosecution of non-tax crimes absent particularized suspicion of wrongdoing meeting the demands of the Fourth Amendment. These laws not only facilitate compliance with a tax system heavily dependent on voluntary reporting but also constitute a fundamental recognition that the information taxpayers are asked to disclose to state and federal departments of treasury is of the most intimate nature and should therefore be afforded a degree of protection correspondingly solemn. Under these circumstances, we have little doubt in concluding that society is willing to recognize Gutierrez's objectively reasonable expectation of privacy in his tax return and return information.

## IV. The Affidavit Supporting the Warrant Fails to Establish Probable Cause to Search Gutierrez's Client File

As an introductory matter, we review the general standard for probable cause under

---

emphasize that there is a distinction, made in the legislative history of section 6103, between disclosure to the IRS or a state department of revenue and disclosure to most other third parties. Namely, in disclosing information to the

IRS or a state department of revenue, a taxpayer has a statutorily established and codified expectation that the information will not be shared with other law enforcement agencies. 26 U.S.C. § 6103.

the Fourth Amendment. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.

 The "probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). "We have stated, however, that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,'" *id.* (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)), "and that the belief of guilt must be particularized with respect to the person to be searched or seized," *Pringle,* 540 U.S. at 371, 124 S.Ct. 795 (citing *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). At the margins, probable cause requires "less than evidence which would justify condemnation or conviction ... [but] more than mere suspicion." *Brinegar,* 338 U.S. at 175, 69 S.Ct. 1302 (internal citation omitted).

 A police officer seeking the issuance of a warrant must present an affidavit containing facts sufficient to "provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The magistrate shall make the probable-cause determination only with reference to the facts contained within the four corners of the affidavit and the reasonable inferences that may be drawn from those facts. *People v. Titus,* 880 P.2d 148, 150 (Colo.1994). In reviewing the validity of a search warrant, we accord a magistrate's probable-cause determination great deference, but that deference "is not boundless." *Leon,* 468 U.S. at 914, 104 S.Ct. 3405.

 Finally, a warrant based on probable cause may issue even where "the owner or possessor of the place to be searched is not then reasonably suspected of criminal involvement." *Zurcher v. Stanford Daily,* 436 U.S. 547, 560, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). Such warrants, however, remain subject to all "the preconditions for a warrant-probable cause, specificity ... and overall reasonableness," and shall not provide "any occasion for officers to rummage at large...." *Id.* at 566, 98 S.Ct. 1970.

**A.**

At its heart, this case involves contrasting interpretations of the probable cause required to support the government's search of the files found on the premises of Amalia's Tax Service. The district attorney contends that the State only needed probable cause to search the premises of Amalia's Tax Service generally, and that this would permit a search of each file found on those premises. For support he cites *Zurcher,* 436 U.S. at 559, 98 S.Ct. 1970, which stated that "valid warrants to search property may be issued when it is satisfactorily demonstrated to the magistrate that fruits, instrumentalities, or evidence of crime is located on the premises." The district attorney also cites *People v. Hearty,* 644 P.2d 302, 310 (Colo.1982), which stated that "probable cause to search means no more than a showing of reasonable grounds to believe incriminating evidence is present on the premises to be searched."

We affirm the trial court's decision. Although precedent is sparse, our review of Fourth Amendment law leads us to conclude that probable cause is required to intrude upon (through search and seizure) each constitutionally protected privacy interest an individual may have, irrespective of whether that interest is in his person or his tax returns.

 First, it is well-established that probable cause to search the premises of a business does not automatically provide probable cause to search each individual found there. In *Ybarra v. Illinois,* 444 U.S. 85, 91–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Court explained that the Fourth Amendment's protections are triggered any time there is an invasion into an individual's reasonable expectation of privacy, even when that individual is located on premises that

law enforcement is generally permitted to search. The court stated:

> Each patron who walked into the Aurora Tap Tavern on March 1, 1976, was clothed with constitutional protection against an unreasonable search or an unreasonable seizure. That individualized protection was separate and distinct from the Fourth and Fourteenth Amendment protection possessed by the proprietor of the tavern or by "Greg." Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search "Greg," it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers.

*Id.* at 91, 100 S.Ct. 338; *see also United States v. Di Re*, 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (rejecting contention that "a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled").

Relying on the Supreme Court's reasoning in *Ybarra*, the Second Circuit summarized the rule: "[A]ny invasion of a person's Fourth Amendment interests must be justified at least by 'specific and articulable facts' directed to the person whose interests are to be invaded." *United States v. Jaramillo*, 25 F.3d 1146, 1151 (2d. Cir.1994) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ Although *Ybarra* and *Jaramillo* dealt with searches of persons, the principle—that probable cause must exist to invade each individual's constitutionally protected interests—applies with equal or greater force when the search targets an individual's documents. In *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Supreme Court warned that "there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers...." The Court continued, "In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Id.*[12] Therefore, "responsible officials, including judicial officials, must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.*

The Ninth Circuit recently exemplified this individualized approach in *United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir.2009) (en banc). In that case, officers obtained a warrant to search and seize the drug testing results for ten baseball players suspected of having used steroids. Those tests were conducted and maintained at Comprehensive Drug Testing, Inc. ("CDT"), which was not itself suspected of committing any crime. The court explained that the "warrant was limited to the records of the ten players as to whom the government had probable cause." *Id.* at 993. However, in executing the warrant, "the government seized and promptly reviewed the drug testing records for hundreds of players in Major League Baseball (and a great many other people)." *Id.* The court of appeals criticized this behavior, stating that this "was an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *Id.* at 1000. Most importantly, the court did not evaluate the warrant by asking whether there was probable cause to believe that evidence of a crime existed on CDT's property or in CDT's files generally. Instead, the court used the same reasoning employed in *Ybarra* and *Jaramillo* and analyzed probable cause in relation to each individual's record.

Judge Campbell articulated a similar approach in his concurrence in *United States v. Abrams*, 615 F.2d 541 (1st Cir.1980). In that case, the court considered a search warrant permitting the seizure of business and medical records found in three doctors' offices and related to an alleged scheme to defraud Medicaid and Medicare. *Id.* at 542. The majori-

---

**12.** In *Andresen,* the Supreme Court actually upheld the use of a search warrant to obtain documentary evidence from an attorney's files. 427 U.S. at 463, 96 S.Ct. 2737. However, in light of the inherent danger posed by such searches, the Court narrowly construed the warrant to authorize only the search and seizure of documents related to a particular piece of real estate (Lot 13T) that was connected to the attorney's crime of false pretenses. *Id.*

ty opinion focused on the warrant's failure to describe with particularity the things to be seized. *Id.* at 543. However, Judge Campbell noted that, even if the warrant had satisfied the particularity requirement, it would have failed to meet the requirement that there be probable cause to search each client's file held by the doctors' offices. He noted:

> In cases of the present sort, I do not believe that a criminal warrant can properly direct the seizure of each Medicare–Medicaid patient's entire file in a doctor's office, with its mix of relevant and irrelevant materials. . . . [S]uch a warrant might be adequately particular, in that it would inform the executing officer precisely what to take (i.e., all files of Medicare–Medicaid patients), but it would violate the probable cause requirement of the [F]ourth [A]mendment, since it would permit the indiscriminate seizure of irrelevant 'innocent' materials of a confidential nature along with materials pertinent to the Medicare–Medicaid fraud being investigated.

*Id.* at 549; *see also United States v. Bithoney,* 631 F.2d 1, 2 (1st Cir.1980) (approving warrant to search attorney's offices, in part, because warrant "restricted seizable materials to documents relating to 17 named individuals—a further significant limitation on its scope, which reduced the likelihood of a general rummaging expedition").

Despite contrary arguments advanced by the prosecution, *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), and *People v. Hearty,* 644 P.2d 302 (Colo.1982), support the conclusion that probable cause must be evaluated in relation to each constitutionally protected interest. In *Zurcher,* the district attorney obtained a warrant to search the offices of the Stanford Daily newspaper for photographs of several individuals suspected of assaulting police officers at a public protest. 436 U.S. at 551, 98 S.Ct. 1970. The only constitutionally protected privacy interest at issue in the case was the Stanford Daily's privacy interest in its own offices. The suspects did not have a reasonable expectation of privacy in the photographs themselves, which were taken by a newspaper photographer while the suspects were at a public protest. The photographs were therefore consummately public. In fact, the opinion notes that the officers who conducted the search "had not been advised by the staff [of the Stanford Daily] that the areas they were searching contained confidential materials." *Id.* Therefore, the *Zurcher* court was correct to analyze probable cause only as it related to the Stanford Daily's premises because the Stanford Daily's privacy interest in its offices was the sole constitutionally protected privacy interest at issue in the case.

In *Hearty,* we also analyzed probable cause in relation to the sole constitutionally protected privacy interest at issue—the homeowner's privacy interest in his own home. 644 P.2d at 309–10. In that case, the warrant authorized a search of the residence of David Iden, one of three individuals suspected of theft and extortion. We analyzed probable cause as follows: "In the case of multiple suspects, for *each* of whom there are reasonable grounds to believe they participated in a particular criminal offense, probable cause to search means no more than a showing of reasonable grounds to believe incriminating evidence is present on the premises to be searched." *Hearty,* 644 P.2d at 310 (emphasis added). This statement does not suggest that officers may ignore the need for individualized probable cause before searching a suspect's residence. In fact, it suggests the opposite. Probable cause was carefully evaluated in relation to *each* individual suspect whose residence was to be searched and whose reasonable expectation of privacy was thereby compromised.

Later in the *Hearty* opinion, we extended this focused approach to probable cause based on each individual's protected privacy interest and affirmed the suppression of evidence seized from the offices of Iden's attorney. *Id.* at 313. Although we focused explicitly on the lack of particularity in the warrant, we did not authorize a broad search of the attorney's files simply because there was reason to believe that evidence of criminal activity would be found there. *Id.* Rather, like Judge Campbell in *Abrams,* we determined that the search must be limited not only to the individual suspects' files but even

to those portions of the files likely to contain evidence related to the crime being investigated and for which probable cause existed. *Id.*

Supporting the individualized protection of privacy interests that we apply here is one limited exception to the rule, which applies when the custodian or business holding the records is "pervaded by fraud." *In re Grand Jury Investigation Concerning Solid State Devices, Inc.,* 130 F.3d 853, 856 (9th Cir. 1997). Applying the pervaded-by-fraud exception, courts have held that, "where there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized, if they are ... accurately described so that the executing officers have no need to exercise their own judgment as to what should be seized." *United States v. Brien,* 617 F.2d 299, 309 (1st Cir.1980). This court has applied the exception quite restrictively, requiring "probable cause to believe that the crime alleged encompasses the *entire* business operation and that evidence will be found in *most or all* business documents." *People v. Roccaforte,* 919 P.2d 799, 803 (Colo.1996) (emphasis added).[13]

■ To summarize, probable cause may not be analyzed merely in relation to the property or premises searched. Rather, unless the custodian or business itself is pervaded by fraud, probable cause must be analyzed in relation to each individual's constitutionally protected interests.

### B.

■ Having determined the proper scope of the probable-cause requirement, we now ask whether the warrant in this case meets that requirement and conclude that it does not.

The affidavit did not provide probable cause to search Gutierrez's individual file. Nowhere in the affidavit is Gutierrez's name mentioned, and the affidavit offers no facts which could "provide the magistrate with a substantial basis," *Gates,* 462 U.S. at 239, 103 S.Ct. 2317, for finding probable cause to believe that evidence of criminal impersonation or identity theft would be found in his particular tax return or client file. Indeed, the affidavit made no reference to any client of Amalia's Tax Service apart from Trejo.

The affidavit stated that "everyone knows to go to" Amalia's Tax Service to have their returns prepared. Even if we adopt the approach urged by the district attorney and interpret "everyone" to refer to undocumented immigrants living or working in Greeley, we cannot stretch the meaning of "everyone" so as to find a reference to Gutierrez in particular. *See Parks v. FDIC,* 65 F.3d 207, 214 (1st Cir.1995) ("The affidavit articulates a generalized suspicion of wrongdoing by the bank directors, but fails to articulate the required individualized suspicion of wrongdoing by the target of the subpoena, Ms. Parks."). Cerrillo's statements are likewise devoid of any reference to Gutierrez, his return, or his client file. The affidavit therefore did not provide probable cause to search Gutierrez's individual tax record.

The pervaded-by-fraud exception also does not apply. The affidavit does not provide probable cause to believe that "most or all" of the files would contain evidence of crime, as required by this court in *Roccaforte.* 919 P.2d at 803. Amalia's Tax Service is not suspected of any fraudulent scheme whatsoever, and no court has applied the pervaded-by-fraud exception to support an all-encompassing search of an innocent third party's files.

Thus, we conclude that the affidavit failed to establish probable cause to search Gutierrez's individual tax return and that Gutierrez's tax return and records were therefore obtained in violation of the Fourth Amendment.

---

**13.** Many other courts have followed this strict approach. *See e.g., United States v. 50 State Distrib. Co.,* 708 F.2d 1371, 1374 (9th Cir.1983) (affirming all-records warrant where fraud was so pervasive that it encompassed "the entire business and therefore *all* business-related" records); *United States v. Stubbs,* 873 F.2d 210, 211 (9th Cir.1989) (invalidating an all-records warrant because the "affidavit fail[ed] to provide probable cause for a reasonable belief that tax evasion permeated [the] entire real estate business").

## V. The "Good Faith" Exception to the Exclusionary Rule Does Not Apply

Although the warrant is not supported by probable cause to believe that evidence of a crime would be found in Gutierrez's tax return, the district attorney argues that suppression is inappropriate because the executing officers acted in an objectively reasonable manner in relying on the warrant, and thus *Leon's* "good faith" exception to the exclusionary rule should apply.

■■■ Ordinarily, when police obtain evidence in violation of the Fourth Amendment, that evidence may not be introduced against the aggrieved individual in either a state or federal criminal prosecution. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This is known as the exclusionary rule. In *Leon,* however, the Supreme Court carved out an exception to the exclusionary rule, holding that evidence obtained in violation of the Fourth Amendment should not be suppressed in circumstances where the evidence was obtained by officers acting in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate, even if that warrant was later determined to be invalid. 468 U.S. at 922, 104 S.Ct. 3405. This is known as the good faith exception to the exclusionary rule.

■■■ Despite its importance, the Court in *Leon* explained that the exclusionary rule is a judicially created remedy, not a personal constitutional right belonging to the individual whose rights were violated. *Id.* at 906, 104 S.Ct. 3405. Therefore, the exclusionary rule should not automatically apply every time a Fourth Amendment violation is found; rather, it should apply only in those circumstances where its remedial objectives are actually served by suppression. *Id.* at 907–08, 104 S.Ct. 3405. The exclusionary rule is aimed at deterring the misconduct of police officers, not magistrates. *Id.* Officers acting in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate do not knowingly engage in misconduct. The Supreme Court therefore concluded that the exclusionary rule should not apply under such circumstances because the social costs of suppression would outweigh any possible deterrent effect. *Id.* at 916–18, 104 S.Ct. 3405.

■■■ However, an officer's reliance on a warrant is not always objectively reasonable. *Leon* articulates four situations in which an officer's reliance on a warrant would not be objectively reasonable and suppression would therefore continue to be an appropriate remedy: (1) where a warrant is based on knowingly or recklessly made falsehoods; (2) where the issuing magistrate wholly abandons his judicial role; (3) where the warrant is so lacking in specificity that the officers could not determine the place to be searched or the things to be seized; or (4) where the warrant is so lacking in indicia of probable cause that official belief in its existence is unreasonable—in other words, a warrant issued on the basis of a 'bare-bones' affidavit. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405; *United States v. McPhearson,* 469 F.3d 518, 525–26 (6th Cir.2006). In the present case, we are concerned primarily with the last of these four situations. Because a search unsupported by a valid warrant is presumptively unconstitutional, the district attorney bears the burden of establishing that the good faith exception applies. *United States v. Longmire,* 761 F.2d 411, 417 (7th Cir.1985).

■■■ An affidavit is considered "bare-bones," and therefore an officer cannot reasonably rely on it, where the affidavit fails to establish a "minimally sufficient nexus between the illegal activity and the place to be searched." *United States v. Carpenter,* 360 F.3d 591, 596 (6th Cir.2004). Often, a bare-bones affidavit is one that consists substantially of conclusory statements, *see, e.g., United States v. Laury,* 985 F.2d 1293, 1311 n. 23 (5th Cir.1993), but this is not always the case. An affidavit that provides the details of an investigation, yet fails to establish a minimal nexus between the criminal activity described and the place to be searched, is nevertheless bare-bones. *See, e.g., United States v. West,* 520 F.3d 604, 610–11 (6th Cir.2008); *United States v. Weber,* 923 F.2d 1338, 1346 (9th Cir.1990) (holding that the affidavit, which failed to establish any nexus between the place searched and criminal activity, was a bare-bones affidavit despite copious expert testimony). As the *Weber* court

observed, the mere fact that the officer-affiant "added fat to the affidavit, but certainly no muscle," is not a basis for finding he acted in good faith. 923 F.2d at 1346.

▮ In addition to assessing the nexus between the place searched and illegal activity, courts look to the time pressure under which the officer-affiant was operating in determining whether the warrant was obtained in good faith. *Id.* Courts may also consider whether judges reviewing the magistrate's probable cause determination are divided on the question of probable cause or whether they have consistently found probable cause to be lacking. *Leon,* 468 U.S. at 926, 104 S.Ct. 3405; *United States v. Tate,* 795 F.2d 1487, 1491 (9th Cir.1986).

▮ In contrast, courts may not consider the magistrate judge's initial decision to issue the warrant. Deference to the magistrate judge's decision is built into the good-faith inquiry itself, and the four scenarios described in *Leon* are designed to isolate circumstances in which that deference may be overcome. *See Leon,* 468 U.S. at 915, 104 S.Ct. 3405 (explaining that magistrate judges' decisions are given deference but that such deference is "not boundless" and that "reviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause'" (quoting *Gates,* 462 U.S. at 239, 103 S.Ct. 2317)). Therefore, to give weight to the magistrate judge's determination at this stage of the inquiry would be duplicative and would defeat the particular objective of the analysis. Likewise, it would serve no purpose to consider the magistrate judge's determination. "By definition, in *every* case in which the prosecution seeks the benefit of *Leon,* a magistrate has issued a warrant.... Because issuance of a warrant is a constant factor in these cases, it cannot logically serve to distinguish among them." *People v. Ca-*

*marella,* 54 Cal.3d 592, 286 Cal.Rptr. 780, 818 P.2d 63, 70 (1991).[14]

We have previously expressed our understanding that there exists considerable overlap between a probable-cause determination under *Gates* and a determination of whether an affidavit is bare-bones under *Leon. People v. Leftwich,* 869 P.2d 1260, 1271 n. 12 (Colo. 1994). If a magistrate's probable-cause determination is nothing more than a matter of "practical, common-sense" decision-making, *Gates,* 462 U.S. at 238, 103 S.Ct. 2317, then it is difficult to envision a warrant that would provide an objectively reasonable basis for a search yet would not support a "practical common-sense" determination of probable cause. *See Leon,* 468 U.S. at 958–59, 104 S.Ct. 3405 (Brennan, J., dissenting); LaFave, *supra,* § 1.3. Nevertheless, we have also acknowledged that some "middle ground" exists between an affidavit setting forth probable cause and a bare-bones affidavit, and that the term "objectively reasonable" may have one meaning when applied to magistrates and another when applied to police officers. *People v. Altman,* 960 P.2d 1164, 1169–70 (Colo.1998).

The objective standard announced in *Leon* "requires officers to have a reasonable knowledge of what the law prohibits." *Leon,* 468 U.S. at 919 n. 20, 104 S.Ct. 3405. At the time the warrant was sought and issued, the law was clear that, in order for a warrant to authorize governmental intrusion into an area where a citizen has a constitutionally protected privacy interest, the accompanying affidavit must establish probable cause to believe that evidence of a crime will be found therein.

The district attorney concedes, from the outset, that a warrant is required in order to search tax returns in the custody of a tax preparer. As discussed, we agree that this is what the law requires. The district attorney's concession on this point is indicative of the relatively non-controversial and obvious pri-

---

14. This same reasoning does not apply when considering whether other judges who have reviewed the affidavit have found probable cause. This factor will not be a constant in every case, and the *Leon* court expressly stated that courts may consider all other circumstances in making a good faith determination, "including whether the warrant application had previously been rejected by a different magistrate," 468 U.S. at 923 n. 23, 104 S.Ct. 3405, and whether the affidavit "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." 468 U.S. at 926, 104 S.Ct. 3405.

vacy interest a taxpayer has in his tax return. *See Broderick*, 225 F.3d at 453–54. The law is also clear that "any invasion of a person's Fourth Amendment interests must be justified at least by 'specific and articulable facts' directed to the person whose interests are to be invaded." *Jaramillo*, 25 F.3d at 1150. With these facts in mind, we determine whether it was objectively reasonable for officers to believe that the warrant in this case satisfied the legal criteria described.

▮ The supporting affidavit in the present case does not merely fail to establish a "sufficient nexus" between Gutierrez's tax return and the suspected criminal activity, it fails to establish any connection at all between Gutierrez and criminal activity. *See Groh v. Ramirez*, 540 U.S. 551, 558, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) ("This warrant did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items. Nor did it make what fairly could be characterized as a mere technical mistake or typographical error. Rather ... the warrant did not describe the items to be seized *at all*."). The affidavit makes no direct mention of Gutierrez, his client file, or

his tax return, and there is no ancillary evidence which could link Gutierrez himself to the suspected criminal conduct.[15] The most that can be objectively inferred from the affidavit is that Trejo's file contained false SSN information and that some unknown number of other clients may have, at some unknown point in the past, provided similarly false information. Such a warrant is so lacking in probable cause to believe that evidence of a crime will be found in Gutierrez's file that no reasonably well-trained officer could rely upon it.

▮ Relatedly, the warrant authorizes a search of all tax returns from 2006 and 2007, but there is no factual support for this authorization. The affidavit does not supply any probable cause to believe that evidence of a crime will be found in tax returns from these years, as opposed to tax returns filed in other years. In addition, we note that the limitations imposed by the warrant on the scope of the search were ineffective, as the officers seized *all* tax returns in Amalia's Tax Service's custody, including those not authorized by the warrant.[16] The fact that, of the 5,000 files searched and seized only 1,300

---

15. As the trial court observed, "There was no information in the affidavit that any law enforcement agency anywhere in the country had received a complaint from a person that his/her name, SSN or any other type of identifying information was used to file tax returns through Amalia's Tax Service, other than one relating to Mr. Trejo's case." Similarly, the trial court noted, "There is no information providing any fictitious name or SSN used by a client of Amalia's Tax Service to work, let alone to work in Colorado."

16. The People argue that the sheriff's removal of the client files from Amalia's Tax Service's premises did not constitute a seizure but was merely part of a "cursory examination" conducted by officers to identify those papers whose seizure was authorized by the warrant. We disagree. "The word 'seizures' in the Fourth Amendment has, in the main, not been a source of difficulty. The act of physically taking and removing tangible personal property is generally a 'seizure.'" LaFave, *supra*, at § 2.1 (internal citations omitted); *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."). The district attorney cites *United States v. Hargus*, 128 F.3d 1358, 1363, a Tenth Circuit case that held that officers' removal of file cabinets and papers not

specified in the warrant did not "grossly exceed the scope of the warrant," because the officers were motivated by the impracticalities of on-site sorting. In addition to noting the danger that wholesale endorsement of such a rule would pose to Fourth Amendment protections, we distinguish that case on its facts. In *Hargus*, the question before the court was whether a search supported by a valid warrant is rendered unconstitutional by an overbroad search. *Id.* In contrast, the question before this court is whether an otherwise unconstitutional search can be saved by the officers' claim of good faith reliance on the warrant itself. Conduct found to be constitutional in one context does not necessarily evince the requisite good faith in the other.

Moreover, as the trial court noted, the People have filed criminal charges against at least thirty-seven individuals whose returns were filed in years other than 2006 and 2007. This fact significantly undercuts the district attorney's argument that they conducted a mere "cursory examination" of these files. Instead, the executing officers inspected these tax returns and compared the information therein with information provided in the clients' wage earning documentation. There is no distinction between the manner in which officers handled returns outside the scope of the warrant and returns whose search and seizure fell within the warrant's terms.

were found to contain evidence of wrongdoing, highlights the absence of any nexus between the particular tax returns searched and criminal activity. It is difficult to understand how reasonably well-trained officers searching through 5,000 different individuals' client files, the substantial majority of which were free from any evidence of wrongdoing, would not, on some basic level, be aware that their endeavor was essentially a fishing expedition. As Justice Holmes observed, conduct of this sort is fundamentally anathema to the letter and spirit of the Fourth Amendment. *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305–06, 44 S.Ct. 336, 68 L.Ed. 696 (1924). He stated:

> Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime.... It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up.

*Id.* (internal citations omitted).

Justice Holmes's observation applies with particular force in the present case. Federal statutory law clearly recognizes the reasonable expectation of privacy that a taxpayer maintains in his or her tax returns, and Congress has established a complex statutory scheme to protect tax returns in the hands of the IRS from discovery for non-tax purposes by other state and federal agencies. It would contradict the spirit of this statutory scheme and the Fourth Amendment itself to permit local law enforcement to circumvent these protections by searching and seizing thousands of individuals' tax returns, without specific probable cause, simply because those returns were located in the offices of a tax preparer who, in full compliance with the law, helped an unknown number of undocumented workers pay their taxes. To permit such a search would effectively eviscerate the protections established by Congress and the Constitution.

Moreover, the officers here operated under no time pressure, and, hence, there "was no need for the 'hurried judgment' upon which law enforcement decisions must often be based." *Weber,* 923 F.2d at 1346. All indications from the record point to Cerrillo's cooperativeness with law enforcement and her candor when speaking with investigating officers. There was no indication that she would conceal or destroy the evidence sought, and thus the sheriff's office had complete control over the timing of the search. Under these circumstances, it is not too much to require information about specific clients suspected of using false SSNs on their wage earning documents.

Finally, unlike *Leon,* the judges who have reviewed the warrant and accompanying affidavit in this case have agreed that probable cause was absent. Four district court judges—three presiding over criminal cases filed against clients of Amalia's Tax Service and one presiding over a related civil case—have arrived at the same conclusion: that the warrant and accompanying affidavit failed to establish sufficient probable cause to search individual taxpayers' files for evidence of criminal impersonation or identity theft.[17]

In light of the considerations discussed above, we conclude that the district attorney has not met his burden to show that the officers' reliance on the warrant was objectively reasonable. To hold otherwise would allow the good faith exception to swallow the exclusionary rule. Accordingly, we hold that *Leon's* good faith exception is inapplicable and suppression of Gutierrez's tax records is appropriate.

## VI. Conclusion

For the reasons stated, we affirm the trial court's order granting the defendant's motion to suppress evidence. We remand this case to that court for proceedings consistent with this opinion.

---

17. These cases are *People v. Herrera,* 08CR2150; *People v. Vargas,* 08CR2008; *Cerrillo v. Buck,* 09SC341; and the present case. *Herrera* and *Vargas* are criminal cases that have been dismissed without prejudice. *Cerrillo* is a civil case currently on appeal before this court.

Justice RICE dissents, JUSTICE EID joins in the dissent.

Justice COATS dissents.

RICE, J., dissenting.

I believe that the police officers' reliance on the warrant was objectively reasonable under the circumstances. Because I would hold that the police officers acted in good faith when they seized the tax records, I find it unnecessary to consider whether the affidavit supporting the warrant failed to establish probable cause.[1] Therefore, I respectfully dissent.

## I. Introduction

Both the Federal and Colorado Constitutions secure "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend. IV; Colo. Const. art. II, § 7. For most of the twentieth century, the exclusive mechanism by which a judge or magistrate could enforce this provision was the exclusionary rule.[2] However, in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the United States Supreme Court changed course. It held that the exclusionary rule unfairly penalized police officers who, acting with objec-

tive good faith, obtained a search warrant from a judge or magistrate and acted within its scope. *Id.* at 920–21, 104 S.Ct. 3405.[3]

Various state and federal courts set about modifying the exclusionary rule to maximize its deterrent effect while facilitating truth finding. *Leon*, 468 U.S. at 906–08, 104 S.Ct. 3405[4]; *People v. Altman*, 960 P.2d 1164, 1168 (Colo.1998).[5] The result was the good faith exception. Unlike the exclusionary rule, which deters police misconduct by excluding evidence obtained via unconstitutional searches and seizures,[6] the good faith exception promotes proper conduct by creating a presumption that evidence collected by officers in compliance with constitutional prerequisites will be admissible at trial. *Leon*, 468 U.S. at 920–21, 104 S.Ct. 3405. The *Leon* Court found that "we have expressed a strong preference for warrants and declared that 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.'" *Leon*, 468 U.S. at 914, 104 S.Ct. 3405 (quoting *United States v. Ventresca*, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). Similarly, this court's stated policy is to "encourage officers to obtain warrants before invading individual privacy." *Altman*, 960 P.2d at 1170.

---

1. A reviewing court may, at its discretion, proceed directly to a good faith analysis without first addressing the issuing judge's determination of probable cause. *United States v. Reza*, 315 F. App'x. 745, 747 (10th Cir.2009) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir.2000)); *see also United States v. Bishop*, 890 F.2d 212, 216 (10th Cir.1989) (finding that "resolution of whether there was probable cause supporting the warrant is not necessary to our decisions ... because ... the agents' conduct clearly falls within the 'good faith exception' to the exclusionary rule.").

2. *See, e.g., Mapp v. Ohio*, 367 U.S. 643, 651, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Olmstead v. United States*, 277 U.S. 438, 462–63, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Hernandez v. People*, 153 Colo. 316, 321–22, 385 P.2d 996, 999–1000 (1963).

3. The *Leon* Court found, " '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.' Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment viola-

tions." *Leon*, 468 U.S. at 921, 104 S.Ct. 3405 (quoting *Stone v. Powell*, 428 U.S. 465, 498, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Burger, C.J., concurring)).

4. *See also Leon*, 468 U.S. at 909–13, 104 S.Ct. 3405 (listing decisions of various courts considering the remedial objectives of the exclusionary rule).

5. In *Altman*, this court found that the exclusionary rule was inappropriate where the "deterrence purpose is not served, or where the benefits associated with the rule are minimal in comparison to the costs associated with the exclusion of probative evidence." *Altman*, 960 P.2d at 1168.

6. Among the policy bases for exclusionary sanctions, "deterrence"—defined as "motivating [police officers] to consciously choose not to violate legal requirements because of a desire to avoid rendering evidence inadmissible"—arguably remains the most compelling. 1 Kenneth S. Broun et al., McCormick on Evidence § 165 (6th ed.2006).

Aware of this sea change in judicial thought, the Colorado General Assembly codified its version of the good faith exception [7] and the "objectively reasonable" standard [8] in section 16–3–308, C.R.S. (2009). Declaring it to be public policy in the State of Colorado that truth finding shall be favored over exclusion of evidence, § 16–3–308(4)(a), the General Assembly established a strong presumption of good faith where a police officer obtains evidence "pursuant to and within the scope of a warrant," § 16–3–308(4)(b).

## II. Discussion

The *Leon* court identified four scenarios where a police officer *cannot* reasonably rely upon a warrant.[9] Of these, the majority determines that the fourth—where an affidavit lacks evidence of probable cause to the extent that believing probable cause exists would be entirely unreasonable (e.g., a bare bones affidavit)—applies. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405. Because the majority concludes the affidavit is bare bones, it holds without further consideration that the police officer's reliance on the warrant was objectively unreasonable.

7. In pertinent part:
(2) As used in subsection (1) of this section:
(a) "Good faith mistake" means a reasonable judgmental error concerning the existence of facts or law which if true would be sufficient to constitute probable cause.
. . . .
(4)(a) It is hereby declared to be the public policy of the state of Colorado that, when evidence is sought to be excluded from the trier of fact in a criminal proceeding because of the conduct of a peace officer leading to its discovery, it will be open to the proponent of the evidence to urge that the conduct in question was taken in a reasonable, good faith belief that it was proper, and in such instances the evidence so discovered should not be kept from the trier of fact if otherwise admissible. . . .
(b) It shall be prima facie evidence that the conduct of the peace officer was performed in the reasonable good faith belief that it was proper if there is a showing that the evidence was obtained pursuant to and within the scope of a warrant. . . .
§ 16–3–308.

8. Section 16–3–308 was enacted prior to the Court's decision in *Leon.* However, this court has held that, in enacting section 16–3–308, the General Assembly intended to apply a substantially

I respectfully disagree. I believe that it is both more sensible and more consistent with this court's precedent to find that the affidavit is not bare bones.

### A. Bare Bones Analysis

Whether a police officer's reliance on an affidavit is objectively reasonable requires careful examination of the facts.[10] The majority sets forth three principle facts in support of its holding that the affidavit in this case is bare bones: (1) the affidavit failed to establish a sufficient nexus between the alleged criminal activity and the place searched; (2) the police officers examined the affidavit for probable cause without undue time pressure; and (3) the reviewing judges unanimously found that the warrant lacked probable cause. I will examine each in turn.

### 1. Sufficient Nexus

The majority determines that, because the affidavit failed to indicate the exact percentage of Amalia's Tax Service's clients who used fake SSNs, an insufficient nexus existed between the alleged criminal conduct (identity theft and criminal impersonation) and the

similar objective standard. *People v. Leftwich,* 869 P.2d 1260, 1272 (Colo.1994).

9. They are: (1) where an otherwise sufficient affidavit is based upon knowingly or recklessly made falsehoods; (2) where the issuing judge abandoned his or her judicial role; (3) where the warrant is not specific enough to enable police officers to determine the place to be searched or the things to be seized; and (4) where the affidavit lacks evidence of probable cause to the extent that believing probable cause exists would be entirely unreasonable (e.g., a bare bones affidavit). *Leon,* 468 U.S. at 923, 104 S.Ct. 3405.

10. *Compare Altman,* 960 P.2d at 1171–72 (rejecting argument that affidavit was bare bones where allegations of drug activity were based on observations of DEA agents; and the State successfully used circumstantial evidence to establish a nexus between the facts reported and the defendant's evidence) *with Leftwich,* 869 P.2d at 1270 (finding bare bones affidavit where allegations of drug activity were supplied by an unidentified informant; such allegations were uncorroborated; and the State unsuccessfully used circumstantial evidence to establish a nexus between the facts reported and the defendant's residence).

place searched (Amalia's Tax Service).[11] Although I agree that an exact percentage,[12] were it available, would contribute to a probable cause determination, I do not believe its absence makes it "entirely unreasonable" for the police officers to have believed that the affidavit would support a warrant.

The affidavit details Trejo's statements that he purchased a SSN when he illegally entered the United States, used the false SSN to obtain employment, hired Amalia's Tax Service to help him with his tax returns, and ultimately filed returns using an ITIN.[13] The affidavit further recalls the statements of Cerrillo, the proprietor of Amalia's Tax Services. Cerrillo stated that she prepared taxes for undocumented workers, explained that "anyone who applies for an ITIN is an [undocumented worker]," and acknowledged that *nearly all* undocumented workers who supply her with wage information used a false SSN.

The majority argues that the most the police officers could reasonably infer from the affidavit is that "some unknown number of other clients" may have provided similarly false information. Maj. op. at 943. This conclusion ignores the fact that Cerrillo indicated that more than one of her clients was an undocumented worker and that "almost all" of her clients in this category used a false SSN. Nor does it take into account that Trejo corroborated Cerrillo's statement when he acknowledged that his tax record, then located at Amalia's Tax Service, contained information regarding criminal activity.

From the affidavit, the police officers knew with certainty that multiple criminal acts oc-curred. They further knew that information regarding these criminal acts was kept in the tax records then located at Amalia's Tax Service. Therefore, in my view, it is not "entirely unreasonable" for the police officers to have determined that a nexus existed between the criminal conduct alleged and Amalia's Tax Service.

### 2. Time Pressure

The majority finds that, because Cerrillo cooperated with the police officers and never indicated that she would conceal or destroy the evidence sought, the officers could have asked her to specifically identify clients she suspected of using false SSNs. The majority's conclusion is, in this regard, speculative. However, because I do not believe that this fact is outcome determinative, I will not discuss it further here.

### 3. Consensus of Reviewing Judges

Finally, the majority finds that, because the judges who reviewed the affidavit found that it failed to establish probable cause, it would be entirely unreasonable for the police officers to rely upon the warrant issued therefrom.

I find this argument troubling for several reasons. First, the district court judge who issued the warrant was satisfied that the affidavit sufficiently established probable cause. In this regard, we owe the district court's judgment "great deference" and should not cast it aside lightly. *Leon*, 468 U.S. at 914, 104 S.Ct. 3405[14]; *People v. Hebert*, 46 P.3d 473, 481 (Colo.2002). Nor does the majority take into account the dis-

---

11. According to the majority, two additional facts—that police seized all 5,000 tax records located at Amalia's Tax Service and that, of the records searched and seized, only 1,300 contained evidence of wrongdoing—support its findings here. In this respect, the majority's decision flatly contradicts *Altman*, 960 P.2d at 1169, n. 3 (finding that a bare bones analysis takes into account only those facts that were evident prior to the warrant's issuance). Thus, the manner in which the warrant was executed (seizure of all 5,000 records) and the results of the search and seizure (that less than half of the records searched contained evidence of wrongdoing) is of no account.

12. Or, as the majority suggests, inclusion of language such as "all," "some," or "most" that would indicate a rough percentage.

13. Trejo also stated that "everyone" (presumably, other undocumented workers who also purchased SSNs) used the service to file their taxes.

14. The Court held that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914, 104 S.Ct. 3405 (citing *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)).

agreement among the members of this court. To my mind, this lack of consensus suggests that sufficient evidence exists to "create disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon*, 468 U.S. at 926, 104 S.Ct. 3405.

Furthermore, "[p]olice officers are not appellate judges." *Altman*, 960 P.2d at 1170. So what is entirely unreasonable for an appellate judge provided the benefit of a complete record may differ considerably from what is entirely unreasonable for a police officer embroiled in an ongoing investigation. *See id.* at 1169–70. This court has held that "by operation of precedent and common sense, a warrant that has failed appellate scrutiny can nonetheless form the basis for good faith execution by a reasonable police officer." *Id.* at 1170. I believe the search in this case should be so treated.

For these reasons, I would find that it was not "entirely unreasonable" for the police officer in this case to rely upon the affidavit. Therefore, the categorical exceptions to the good faith rule announced in *Leon* do not apply here. *Leon*, 468 U.S. at 923, 104 S.Ct. 3405.

## B. Good Faith Analysis

Having determined that the affidavit supporting the warrant in this case is not a bare bones affidavit, I now consider whether it was objectively reasonable for the police officers to rely upon the warrant so issued.

When an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope, excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty. *Leon*, 468 U.S. at 920, 104 S.Ct. 3405 (quoting *Stone*, 428 U.S. at 498, 96 S.Ct. 3037 (Burger, C.J., concurring)). When viewed together with the General Assembly's express declaration that truth finding shall be favored over exclusion, § 16–3–308(4)(a), the clear policy of this state must be to accord "great deference" to

the issuing judge's determination. *Leon*, 468 U.S. at 914, 104 S.Ct. 3405.

Consistent with that policy, Colorado law establishes a strong presumption of good faith where the evidence at issue was obtained pursuant to a warrant. § 16–3–308(4)(b).[15] Because I believe that the police officers' reliance on the warrant was objectively reasonable, I would find good faith here.

To hold, as the majority does, that the good faith exception does not apply, penalizes the police officers for a decision belonging to the district court judge. As doing so cannot logically contribute to the deterrence of police misconduct, I respectfully dissent from the majority opinion.

I am authorized to state that JUSTICE EID joins in this dissent.

Justice COATS, dissenting.

Not only do I disagree with the majority's analysis of the problem it sets for itself, but I am also convinced that a number of mistaken presumptions about the effects of federal legislation have led it to address a theoretical problem arguably more thorny than the one actually presented by the search in this case. The majority seems to consider it self-evident that federal statutes permitting the issuance of individual tax identification numbers and requiring the payment of income taxes, irrespective of immigration status, effectively shield tax-preparers from criminal liability for aiding taxpayers to knowingly report income earned under social security numbers belonging to someone else; and in addition, it unselfconsciously presumes that federal statutes limiting the circumstances under which tax information may be lawfully disclosed effectively create, at one and the same time, a constitutionally protected expectation of privacy in each individual taxpayer. Because I would not only reverse the district court's suppression order as a misapplication of the good faith exception to the Fourth Amendment exclusionary rule, but would also find that the search in this case

---

**15.** Although the fact that a warrant was issued "is of no moment" when determining whether an affidavit qualifies as bare bones, *Leftwich*, 869 P.2d at 1269, n. 11, the judge's decision to issue a warrant may be analyzed when determining whether a police officer acted in good faith. *Altman*, 960 P.2d at 1169, n. 3.

conformed to the dictates of the Fourth Amendment, I write separately to express my views.

The majority distinguishes existing Supreme Court precedent concerning searches of offices housing multiple client files and considers this case to rest in an area of law with sparse precedent of any kind, on the premise that no criminal conduct was alleged against the tax-preparer whose office was to be searched. Whether this presumption flows from the majority's understanding of federal tax statutes or state criminal statutes, or simply the prosecution's failure to claim otherwise, I believe it is a mistake that fundamentally distorts the majority's Fourth Amendment analysis.[1]

In this jurisdiction, intentionally assisting someone to use the personal identifying information of another to obtain money (or any other thing of value for that matter) is a felony. *See* § 18–1–603, C.R.S. (2009) (complicity theory of liability); § 18–5–902, C.R.S. (2009) (crime of identity theft). The affidavit supporting the warrant at issue here not only asserted the tax-preparer's awareness of mismatches but also expressly included an admission of her awareness that most of the clients for whom she secured individual tax identification numbers and filed returns using the ITIN process provided her with a social security number belonging to someone else. This admission not only evidenced a misprision but provided grounds to believe the files in her office would point to her own complicity in multiple crimes of identity theft.

The federal statutes referenced by the majority admittedly provide a method for those without social security numbers, regardless of the reason for this shortcoming, to nevertheless meet their federal income tax obligations; and they clearly prohibit tax-pre-

parers from unilaterally disclosing the tax information provided to them. It may even be the case, as the amici assert, that the Internal Revenue Service deliberately publicizes its own lack of interest in discovering the immigration status of individuals filing tax returns and actually promotes various filing techniques or methods to prevent this information from coming to its attention. But nothing in the federal statutes purports to shield either taxpayers or tax-preparers from prosecution for criminal conduct.

Properly analyzed, the affidavit in this case alleged, on the basis of information from witnesses with first-hand knowledge, not only probable cause to believe that the office to be searched would contain evidence of identity theft by some as yet unknown taxpayers but also that this evidence would probably implicate the tax-preparer herself; be pervasive in scope; and expose to more than cursory inspection *only* those returns with easily ascertainable conflicting identification numbers. Following the Supreme Court's lead in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), numerous courts have approved the search of multiple client files, including attorney files and medical files, upon a showing of probable cause that evidence of a crime committed by the service provider is in some of the files, despite any privacy interest the clients may have in their files. *See, e.g., Andresen*, 427 U.S. at 478–84, 96 S.Ct. 2737 (upholding a search of the files in the office of an attorney who was suspected of criminal activity); *In re Impounded Case (Law Firm)*, 840 F.2d 196, 200 (3d Cir.1988) (noting that "courts have consistently allowed searches of law offices when the attorneys involved were the targets of criminal investigations" and upholding the search of all of a law firm's personal injury

---

1. Perhaps in recognition of the tenuousness of their applicability in this context, the majority does not attempt to rely on doctrines of waiver or judicial admission, but instead affirmatively defends the tax-preparer's practices. By footnote, Maj. op. at 930 n. 4, it announces ex cathedra, virtually without discussion or analysis, that the allegations of the affidavit could not implicate the tax-preparer in the crime of identify theft because knowingly filing a tax return reporting income under someone else's social security

number could not constitute a crime. As I indicate below, I disagree and believe that using someone else's identifying information to claim a tax refund, or even simply to help establish one's status as a taxpayer, could very well violate the elements of our identity theft statute.

In addition, I consider the fact that an employee of the Colorado Department of Revenue did not think the tax-preparer's conduct violated federal tax laws to be completely irrelevant to the question of identity theft.

files for evidence of the attorneys' suspected corporate tax crimes); *United States v. Lievertz*, 247 F.Supp.2d 1052, 1063 (S.D.Ind.2002) (noting that "the government had a compelling interest in identifying illegal activity and in deterring future criminal misconduct, an interest which outweighs the privacy rights of those whose records were turned over to the government" and upholding the search of all of a doctor's medical files for evidence that the doctor was involved in a scheme to overprescribe and distribute controlled substances). At least under the unique circumstances of this case, the majority should have found the affidavit and warrant sufficient to pass constitutional muster, without requiring particularized information about named taxpayers, according to well-established principles of Fourth Amendment jurisprudence. *See United States v. Abrams*, 615 F.2d 541, 545 (1st Cir.1980) ("In the first place, if an affidavit contains an averment by an employee that fraudulent practices were regularly pursued during his or her employment, and the term of such employment is set forth, the warrant could authorize the seizure of all records of Medicare and Medicaid services billed and purportedly performed during that period. In the second place, if the means of identification required some analysis and matching, e.g., by comparing patients' invoices with records of actual tests performed, this is a sufficient guarantee of particularity."); *see also Andresen*, 427 U.S. at 478–84, 96 S.Ct. 2737; *People v. Roccaforte*, 919 P.2d 799, 803 (Colo.1996) (recognizing that a warrant may even authorize the seizure of all of a business's records where there is probable cause to believe that evidence will be found in most or all business documents).

In any event, however, the majority also presumes that the existence of federal legislation prescribing criminal penalties for the unauthorized disclosure of individual tax information creates a constitutionally significant expectation on the part of each individual taxpayer that his tax information is safe from disclosure. It does this even though both the United States Supreme Court and this court have previously concluded that it is not reasonable, for Fourth Amendment purposes, for a taxpayer to expect freedom from governmental intrusion into information giv-

en to a tax-preparer. *See Couch v. United States*, 409 U.S. 322, 335–36, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *Losavio v. Robb*, 195 Colo. 533, 540, 579 P.2d 1152, 1157 (1978) (concluding that a subpoena duces tecum for an income tax return "does not invade any constitutional rights" because "[t]he Fourth Amendment's prohibition against unreasonable searches and seizures does not protect documents already in the public domain, such as income tax returns."). The counterintuitive, and in fact anomalous, effect of this proposition is that by statutorily proscribing the disclosure of individual tax information under specific and limited circumstances, Congress necessarily creates a reasonable expectation on the part of individual taxpayers that their tax information may be disclosed to law enforcement officers only upon satisfaction of the requirements of the Fourth Amendment. For hopefully obvious reasons, this proposition has been widely rejected by those courts considering it.

In related contexts, in which the Supreme Court has found there to be no constitutionally cognizable expectation of privacy, claims that subsequent congressional action prohibiting disclosure without a court order effectively creates such a constitutionally cognizable expectation have been uniformly rejected by the federal courts. Following the Supreme Court's conclusion, for example, in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), that individuals lack any protected Fourth Amendment interest in records held by their banks, the Fifth Circuit Court of Appeals flatly rejected, with regard to the enactment of 12 U.S.C. §§ 3401–3422, reasoning virtually identical to that adopted by the majority today. *See United States v. Kington*, 801 F.2d 733, 737 (5th Cir.1986) ("While it is evident that Congress has expanded individuals' right to privacy in bank records of their accounts, appellees are mistaken in their contention that the expansion is of constitutional dimensions. The rights created by Congress are statutory, not constitutional."); *see generally, United States v. Thomas*, No. 88–6341, 878 F.2d 383, 1989 WL 72926 at *2 (6th Cir. July 5, 1989) ("We agree with all other courts addressing the issue and hold that courts are

not required to suppress evidence obtained as a result of the government's unauthorized access to a defendant's bank records."). Similarly, following the Supreme Court's holding in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), several circuits have essentially rejected this same reasoning with regard to congressional action requiring court orders for pen registers.[2] *See United States v. German*, 486 F.3d 849, 854 (5th Cir.2007) (declining to suppress evidence gathered in violation of 18 U.S.C. §§ 3121–3127); *United States v. Thompson*, 936 F.2d 1249, 1251–52 (11th Cir.1991) (same); *see also Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1026 n. 3 (2d Cir.1980) ("The fact that Congress has now enacted the Privacy Protection Act of 1980, Pub.L. No. 96–440, 94 Stat. 1879 (Oct. 13, 1980), which limits the circumstances under which documentary material may be seized from journalists and authors, does not affect the Supreme Court's interpretation of the requirements of the Fourth Amendment in *Zurcher*.").

Since its enactment, every circuit court to address the statute limiting disclosure by the IRS, 26 U.S.C. § 6103, has concluded that, because the statute provides its own express remedies, suppression of evidence in a criminal case is not a permissible remedy. *See, e.g., United States v. Orlando*, 281 F.3d 586, 596 (6th Cir.2002). For the same reason, suppression of tax records is not an appropriate remedy for any violation of 26 U.S.C. § 7216 by tax-preparers. *See United States v. Ware*, 161 F.3d 414, 424–25 (6th Cir.1998) (holding that the exclusionary rule did not apply to alleged violations of 18 U.S.C. § 201(c)(2), which establishes criminal penalties for paying a witness to testify, noting that "[g]enerally, when Congress has designated a specific remedy for violation of one of its acts, courts should presume that Congress has engaged in the necessary balancing of interests to determine the appropriate penalty").

Unlike the majority, I therefore think it clear that the defendant had no constitutionally cognizable expectation of privacy in either his tax-preparer's copy of his tax returns or any tax information he gave her for the express purpose of providing it to the federal (and presumably state) government. Similarly, I would find that the federal statutes relied on by the majority, which purport on their face to provide only a limited expectation of non-disclosure and include specific penalties for violations, do not contemplate the exclusion of evidence from a criminal proceeding.

Even if the Supreme Court were to ultimately reject the reasoning of these federal appellate courts and accord Congress the power to create constitutionally protected expectations of privacy, improbable as I consider that to be, I would nevertheless take issue with the majority's treatment of the search of a tax-preparer's records as if it were a search of individual taxpayers themselves. In part because human beings, unlike inanimate objects, are generally capable of moving and adding or shedding possessions at will, their mere presence at a searchable location will rarely justify a search of their person as well. *See Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (patron within tavern); *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (passenger within car). Privacy expectations in writings meriting particularly strong protection, even if tax records were to fall within that class, *see Stanford v. Texas*, 379 U.S. 476, 485 & n. 16, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (distinguishing writings containing ideas from writings simply chronicling criminal activity), are, however, separately and adequately protected by rigid adherence to the particularity requirement, which the majority apparently considers satisfied here. *See, e.g., People v. Hearty*, 644 P.2d 302, 313 (Colo.1982) ("We believe that rigid adherence

2. We have, of course, found a separate reasonable expectation of privacy in bank records and phone company records of incoming and outgoing calls under the state constitution. *See People v. Corr*, 682 P.2d 20, 26–28 (Colo.1984); *People v. Sporleder*, 666 P.2d 135, 140–41 (Colo.1983); *Charnes v. DiGiacomo*, 200 Colo. 94, 98–100, 612

P.2d 1117, 1119–21 (1980). In addition to the fact that the majority nowhere relies on the state constitution, however, I also believe that the holdings of those cases would not extend to a tax-preparer's copies of tax returns, prepared for the specific purpose of being provided to a governmental agency.

to the particularity requirement is appropriate where a lawyer's office is searched for designated documents."). The majority's remarkable addition of a requirement that suspicion be sufficiently particularized to justify a search of each individual taxpayer himself is without analog in the jurisprudence of either this court or the Supreme Court. Cf. *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1055 (Colo.2002) ("The Supreme Court's pronouncements in *Zurcher* can be read to mean that, beyond the 'scrupulous exactitude' requirement, the First Amendment places no special limitation on the ability of the government to seize expressive materials under the Fourth Amendment.").

By contrast, containers, regardless of ownership, may very well be subjected to a search as the result of their mere presence at a location for which a search is authorized. *See Houghton*, 526 U.S. at 299–307, 119 S.Ct. 1297 (concluding that if there is probable cause to search a car, police officers may search any container in the car capable of concealing the object of the search regardless of its owner and without individualized probable cause that the object will be found in any particular container). While the invasion of spaces within the exclusive control of innocents must always remain a countervailing consideration, there is no suggestion that the tax returns at issue here were owned or controlled by the individual taxpayers at all, much less to the exclusion of others. In any event, the warrant in this case authorized only the search of returns evidencing the assignment of both a social security number and an ITIN to the same taxpayer; and for aught that appears in the record, the warrant was executed with care not to invade the contents of any other returns by more than cursory inspection for this identifying information. Despite the fact that a large number of returns bore signs of probable criminal wrongdoing and were therefore subjected to a search, under these circumstances I consider the majority's caution against general warrants to be entirely out of place.

Finally, although raising the specter of "writs of assistance" may subtly suggest otherwise, I feel compelled to emphasize my view that immigration status is not in any way at issue in this case. The tax files at issue here were not searched to discover evidence that individuals were not lawfully in the county. As the majority makes clear, federal law provides a mechanism by which even those individuals may comply with their federal tax obligations with some assurance that the IRS will not automatically turn that information over to law enforcement agencies. Rather, the files were searched for evidence of identity theft and criminal impersonation, serious crimes that create considerable negative consequences for their victims. An individual's immigration status cannot excuse the commission of such independent, criminal conduct, even if it was motivated by that immigration status or an attempt to conceal it.

At issue in this case is the question whether a tax-preparer's admission that she helped taxpayers earning income under social security numbers known to belong to other people to obtain (and file tax returns under) different individual tax identification numbers provides probable cause to search her office and seize those tax returns reflecting both kinds of identification number. Because I believe it does, I respectfully dissent.